**THIRD NATIONAL BANK IN NASH-VILLE, Plaintiff–Appellant,**

v.

**WEDGE GROUP INCORPORATED, Defendant–Appellee.**

**No. 88–5825, 6019.**

United States Court of Appeals, Sixth Circuit.

Argued April 20, 1989.

Decided Aug. 16, 1989.

Rehearing Denied Sept. 22, 1989.

Garry K. Grooms, Thomas P. Kanaday, Jr. (argued), Farris, Warfield & Kanaday, Nashville, Tenn., for plaintiff-appellant.

Stephen A. Riley, Bass, Berry & Sims, Nashville, Tenn., Paul E. Harris, R. Allen Ashcraft, Jr., Steven B. Harris (argued), Harris & Westmoreland, Houston, Tex., for defendant-appellee.

Before KEITH, KENNEDY and RYAN, Circuit Judges.

RYAN, Circuit Judge.

This appeal presents a question of the reach of the Tennessee long-arm statute, which is coextensive with the limits of due process. The district court dismissed the diversity action of plaintiff Third National Bank in Nashville, holding that defendant WEDGE Group Incorporated was not subject to personal jurisdiction in Tennessee. We disagree and reverse.

## I.

From 1982 to 1986 Third National Bank in Nashville, a Tennessee bank, made loans totalling approximately $42 million to The Rogers Companies, Inc. ("TRC"), a construction firm incorporated in Delaware and with its principal place of business in Tennessee. TRC was a wholly-owned subsidiary of WEDGE Group Incorporated, a Delaware corporation with its principal place of business in Texas. In conjunction with its loans to TRC, Third National obtained a security interest in, among other assets, TRC's accounts receivable and rights to payment.

TRC, along with its various subsidiaries, had entered a "Tax Sharing Agreement" with WEDGE in 1980. This agreement was executed in Texas and, by its terms, is subject to Texas law. Under the agreement, WEDGE, TRC, and TRC's subsidiaries formed a consolidated group for income tax reporting purposes and filed consolidated federal income tax returns. The agreement required TRC to calculate a "hypothetical" tax liability, as if it and its subsidiaries were not members of the consolidated group, and if this hypothetical tax liability was more than TRC's share of actual taxes paid under the consolidated group tax return, TRC was liable to WEDGE for the difference; if the hypothetical liability was less than TRC's actual tax payments, WEDGE was liable to TRC for the difference. WEDGE was also obligated under the Tax Sharing Agreement to pay TRC an amount equal to the tax benefit to the consolidated group of any TRC net operating losses used to offset group income in the consolidated return.

After the Tax Sharing Agreement was executed in October 1980, WEDGE officers who served as TRC directors met regularly in Nashville with TRC personnel to review and direct the operations of TRC and its subsidiaries. These meetings occurred on a monthly basis through 1984 and less frequently in 1985 and 1986.

In April and May 1985, WEDGE officers and TRC personnel negotiated with Third National for a continued extension of credit from Third National to TRC and its subsidiaries. These negotiations resulted in a third amendment to the Third National–TRC loan agreement, dated June 1985. To induce Third National to enter this amended agreement, WEDGE agreed to make a capital contribution to TRC of $7.5 million, which WEDGE deposited in a checking account at Third National. Only WEDGE officers were authorized to direct disbursements from this Tennessee bank account.

In 1986, TRC's financial position deteriorated, and WEDGE officers negotiated with TRC management for the sale of WEDGE's ownership interest in TRC. During these negotiations, WEDGE sought to deny liability for amounts owed TRC under the Tax Sharing Agreement. The issue was temporarily resolved in June 1986, when representatives of WEDGE, Third National, and TRC met in Nashville and entered an "Agreement Relative to Accounts Receivable," also known as the "Tax Receivable Agreement." Under this agreement, Third National agreed temporarily to forbear seeking collection from WEDGE of amounts owed by WEDGE to TRC under the Tax Sharing Agreement. Upon execution of the Tax Receivable Agreement, WEDGE completed its sale of its ownership interest in TRC to TRC management.

Subsequently, TRC allegedly defaulted on its loan obligations to Third National, and in November 1987 Third National brought this diversity action against WEDGE in the United States District Court for the Middle District of Tennessee. Third National claims that TRC owes approximately $6.2 million under their loan agreement, and that "[b]y reason of [Third National's] security interest in [TRC's] Accounts, Third National is entitled to enforce TRC's rights under the Tax Sharing Agreement with WEDGE." Third National claims that under the Tax Sharing Agreement WEDGE owes TRC, and therefore Third National, approximately $2.6 million.

In December 1987, WEDGE filed a motion to dismiss under Fed.R.Civ.P. 12(b)(2) for lack of personal jurisdiction. After the magistrate recommended denial of the motion, WEDGE timely filed objections, and in

an order dated May 1988 the district court rejected the magistrate's recommendation and granted WEDGE's motion to dismiss. The district court denied Third National's motion to reconsider, and this appeal followed.

## II.

"The burden of establishing jurisdiction is on the plaintiff." *Welsh v. Gibbs*, 631 F.2d 436, 438 (6th Cir.1980), *cert. denied*, 450 U.S. 981, 101 S.Ct. 1517, 67 L.Ed.2d 816 (1981). The district court granted WEDGE's motion to dismiss without an evidentiary hearing, relying solely on the pleadings, affidavits, and other written submissions. In such a case, "the burden on the plaintiff is relatively slight and the district court 'must consider the pleadings and affidavits in the light most favorable to the plaintiff.'" *Welsh*, 631 F.2d at 439 (citation omitted.) "[T]he plaintiff should be required only to make a prima facie case of jurisdiction, that is, he need only 'demonstrate facts which support a finding of jurisdiction in order to avoid a motion to dismiss.'" *Welsh*, 631 F.2d at 438 (citation omitted).

In a diversity case, a federal court determines whether personal jurisdiction exists over a nonresident defendant by applying the law of the state in which it sits. *American Greetings Corp. v. Cohn*, 839 F.2d 1164, 1167 (6th Cir.1988). The Tennessee long-arm statute provides for personal jurisdiction over nonresidents on "[a]ny basis not inconsistent with the constitution of this state or the United States." Tenn. Code Ann. § 20–2–214 (1980). Under this statute, Tennessee courts exercise personal jurisdiction "to the full limit allowed by due process." *Masada Investment Corp. v. Allen*, 697 S.W.2d 332, 334 (Tenn.1985). The sole question on this appeal, therefore, is whether the exercise of personal jurisdiction over WEDGE in Tennessee would violate due process.

The Supreme Court has held repeatedly that

> due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."

*International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940)). The critical question minimum-contacts analysis seeks to answer is whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S.Ct. 559, 569, 62 L.Ed.2d 490 (1980).

In analyzing the due-process limits of personal jurisdiction, a distinction is made between "general" jurisdiction and "specific" jurisdiction. *See, e.g., Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 & 473 n. 15, 105 S.Ct. 2174, 2181 & 2182 n. 15, 85 L.Ed.2d 528 (1985). In a case of general jurisdiction, a defendant's contacts with the forum state are of such a "continuous and systematic" nature that the state may exercise personal jurisdiction over the defendant even if the action is unrelated to the defendant's contacts with the state. *See, e.g., Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952). In a specific jurisdiction case, "a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 1872 n. 8, 80 L.Ed.2d 404 (1984). We think it apparent that WEDGE's contacts with Tennessee are not of a "continuous and systematic" nature such that Tennessee could maintain personal jurisdiction over WEDGE in an action unrelated to its Tennessee contacts. Thus, personal jurisdiction in this case, it it exists, must be specific jurisdiction.

In *Southern Machine Co. v. Mohasco Industries, Inc.*, 401 F.2d 374 (6th Cir. 1968), a case of specific jurisdiction, this court set forth a three-part test for deter-

mining whether, consistent with due process, personal jurisdiction may be exercised:

First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

401 F.2d at 381. Analyzing the present case under the three *Southern Machine* criteria, we conclude that specific jurisdiction exists over WEDGE in Tennessee.

### A.

The first *Southern Machine* criterion requires that the defendant must have "purposefully avail[ed] [it]self of the privilege of acting in the forum state or causing a consequence in the forum state." The "purposeful availment" requirement

ensures that a defendant will not be haled into a jurisdiction as a result of "random," "fortuitous," or "attenuated" contacts, *Keeton v. Hustler Magazine, Inc.,* 465 U.S. [770] at 774, 79 L.Ed.2d 790, 104 S.Ct. 1473 [at 1478 (1984)] *World–Wide Volkswagen Corp. v. Woodson, supra,* [444 U.S. 286] at 299, 62 L.Ed.2d 490, 100 S.Ct. 559 [at 568], or of the "unilateral activity of another party or a third person," *Helicopteros Nacionales de Colombia, S.A. v. Hall, supra,* [466 U.S. 408] at 417, 80 L.Ed.2d 404, 104 S.Ct. 1868 [at 1873]. Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant *himself* that create a "substantial connection" with the forum State. *McGee v. International Life Insurance Co.,* 355 U.S. at 223, 2 L.Ed.2d 223, 78 S.Ct. 199 [at 201]; *see also Kulko v. California*

*Superior Court,* 436 U.S. at 94 n. 7, 56 L.Ed.2d 132, 98 S.Ct. 1690 [at 1698 n. 7].

*Burger King,* 471 U.S. at 475, 105 S.Ct. at 2183–84 (emphasis in original; footnotes omitted).

■ WEDGE has never directly conducted business, held title to property, or retained employees in Tennessee. Nonetheless, it has performed various acts in Tennessee and established various contacts with the state. First, from 1978 to 1986, WEDGE was the 100% owner of TRC, a corporation that, along with its own subsidiaries, conducted business in Tennessee.[1] Second, WEDGE was not a mere passive owner of TRC; from 1982 to 1986 WEDGE officers served as TRC directors and met regularly—as often as monthly—in Tennessee to review and direct TRC's operations. Third, WEDGE was a party to the Tax Sharing Agreement with TRC and TRC's subsidiaries, under which WEDGE shared income tax liability with these Tennessee companies. Fourth, in 1985, WEDGE officers participated in negotiations between Third National and TRC regarding the Third National–TRC third amended loan agreement, and, in order to induce Third National to enter the amended loan agreement, WEDGE deposited $7.5 million in a checking account maintained at a Third National branch in Tennessee. Fifth, in 1986 WEDGE entered the "Tax Receivable Agreement" with Third National and TRC. This agreement, which directly addresses potential liability of WEDGE to TRC—and, therefore, to Third National—was executed in Tennessee.

We have no hesitancy in concluding that, by these actions and contacts, WEDGE "purposefully availed" itself of acting and causing consequences in Tennessee and that its contacts with the state were not "random," "fortuitous," "attenuated," nor the result of "the unilateral activity of another party." Therefore, we hold that the first *Southern Machine* criterion is satisfied.

---

1. We reject WEDGE's argument that, to the extent its contacts with Tennessee arose from its ownership interest in TRC, the contacts do not "count" for personal jurisdiction purposes. This court has held that the ownership of a subsidiary that conducts business in the forum is "one

contact or factor to be considered in assessing the existence or non-existence of the requisite minimum contacts." *Velandra v. Regie Nationale des Usines Renault,* 336 F.2d 292, 297 (6th Cir.1964).

B.

The second *Southern Machine* requirement is that "the cause of action must arise from the defendant's activities" in Tennessee. WEDGE argues that this requirement is not satisfied because Third National's cause of action to enforce its rights as a secured creditor of TRC arose from the Tax Sharing Agreement, which was executed in Texas and is governed by Texas law, or from the Third National–TRC loan agreement, and not from WEDGE's activities in and contacts with Tennessee.

WEDGE's argument misses the mark. In *Southern Machine,* this court made clear that the second criterion does not require that the cause of action formally "arise from" defendant's contacts with the forum; rather, this criterion requires only "that the cause of action, of whatever type, *have a substantial connection with* the defendant's in-state activities." 401 F.2d at 384 n. 27 (emphasis added); *cf. Lanier v. American Board of Endodontics,* 843 F.2d 901, 909 (6th Cir.) (holding that "arising out of" requirement of state long-arm statute was satisfied if the cause of action was "made possible by" or "lies in the wake of" the defendant's state contacts), *cert. denied,* —— U.S. ——, 109 S.Ct. 310, 102 L.Ed.2d 329 (1988). "Only when the operative facts of the controversy are not related to the defendant's contact with the state can it be said that the cause of action does not arise from that [contact]." 401 F.2d at 384 n. 29.[2]

We are satisfied that Third National's cause of action against WEDGE to enforce its rights under its security agreement with TRC has "a substantial connection with" and is "related to" WEDGE's contacts with Tennessee. The following contacts in particular have a close relationship with Third National's action: WEDGE entering the Tax Sharing Agreement—the source of the claimed liability of WEDGE to TRC, and therefore to Third National—with TRC, a Tennessee corporation; WEDGE interjecting itself in negotiations between Third National and TRC regarding the Third National–TRC third amended loan agreement, and depositing $7.5 million in a Tennessee bank account maintained at Third National to induce Third National to enter the amended loan agreement; and WEDGE entering, with Third National and TRC, the Tax Receivable Agreement in Tennessee, under which the parties stated their purported rights under the Third National–TRC loan agreement. We therefore hold that the second *Southern Machine* requirement is satisfied.

C.

The final *Southern Machine* requirement is that "the acts of the defendant or

2. In *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984), the Supreme Court expressly declined to reach the questions
(1) whether the terms "arising out of" and "related to" describe different connections between a cause of action and a defendant's contacts with a forum, and (2) what sort of tie between a cause of action and a defendant's contact with a forum is necessary to a determination that either connection exists.
466 U.S. at 415 n. 10, 104 S.Ct. at 1872 n. 10. The law of this circuit—that the "arising from" requirement is satisfied if the cause of action is "related to" or "connected with" the defendant's forum contacts—is consistent with the Supreme Court's language in *International Shoe:*
[T]o the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations, and, so far as those obligations arise out of *or are* connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue.
326 U.S. at 319, 66 S.Ct. at 159 (emphasis added); *see also Helicopteros Nacionales,* 466 U.S. at 427, 104 S.Ct. at 1878 ("Limiting the specific jurisdiction of a forum to cases in which the cause of action formally arose out of the defendant's contacts with the State would subject constitutional standards under the Due Process Clause to the vagaries of the substantive law or pleading requirements of each State.") (Brennan, J., dissenting). This circuit's position is also consistent with that taken by at least two other circuits. *See City of Virginia Beach v. Roanoke River Basin Ass'n,* 776 F.2d 484, 487 (4th Cir.1985); *Southwire Co. v. Trans–World Metals & Co.,* 735 F.2d 440, 442 (11th Cir.1984); *see also* Twitchell, *The Myth of General Jurisdiction,* 101 Harv.L.Rev. 610, 662–63 (1988).

consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." This requirement involves

> a determination of whether Tennessee has an interest in resolving the conflict at issue; but, once the first two questions have been answered affirmatively, resolution of the third involves merely ferreting out the unusual cases where that interest cannot be found.

*Southern Machine,* 401 F.2d at 384. This court has stated that "[w]hen the first two elements are met, an inference arises that the third, fairness, is also present; only the unusual case will not meet this third criterion." *First National Bank v. J.W. Brewer Tire Co.,* 680 F.2d 1123, 1126 (6th Cir.1982). As the Supreme Court recently stated,

> where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable. Most such considerations usually may be accommodated through means short of finding jurisdiction unconstitutional. For example, the potential clash of the forum's law with the "fundamental substantive social policies" of another State may be accommodated through application of the forum's choice-of-law rules.

*Burger King,* 471 U.S. at 477, 105 S.Ct. at 2184.

WEDGE sets forth no considerations that would render the exercise of personal jurisdiction over it in Tennessee unreasonable. Tennessee has interests in resolving this case, not the least of which is to provide a forum for the adjudication of a dispute between a resident and a nonresident that has purposefully availed itself of acting in and causing consequences in Tennessee. Any interest Texas may have in this case, as the result of the parties signing the Tax Sharing Agreement in Texas and providing that it would be governed by Texas law, may be accommodated by application of Texas law, if appropriate. We

hold that the third *Southern Machine* requirement is satisfied.

Because we conclude that the three-part *Southern Machine* test is satisfied, we hold that WEDGE is subject to personal jurisdiction in Tennessee in this action. Accordingly, the judgment of the district court is REVERSED and the case is REMANDED for further proceedings.

KEITH, Circuit Judge, concurring.

I agree with the majority's assessment that in the present case, defendant WEDGE is subject to personal jurisdiction in Tennessee. I write separately, however, to express my views on the substantial due process issues that arise when jurisdiction over a corporate parent, such as WEDGE, is obtained by virtue of jurisdiction over a wholly-owned subsidiary, such as TRC.

On appeal, WEDGE argues that its alleged contacts with Tennessee arose solely from its ownership of TRC. In addition, WEDGE contends that it should not be required to respond to a Tennessee lawsuit on the sole ground that its subsidiary, TRC, conducted business in Tennessee. The majority opinion dismisses WEDGE's arguments in an initial footnote, stating that:

> This court has held that the ownership of a subsidiary that conducts business in the forum is "one contact or factor to be considered in assessing the existence or non-existence of the requisite minimum contacts." *Velandra v. Regie Nationale Des Usines Renault,* 336 F.2d 292, 297 (6th Cir.1964).

The majority then proceeds to resolve the issues raised by the present action solely under the standards set forth by this court in *Southern Machine Co. v. Mohasco Industries, Inc.,* 401 F.2d 374 (6th Cir.1968). It is on this point that my views tend to differ with those of the majority. I am of the opinion that the present case is governed by this court's holding in *Velandra v. Regie Nationale Des Usines Renault,* 336 F.2d 292 (6th Cir.1964). Thus, differing from the approach of the majority, I would emphasize and apply the *Velandra* rule for determining when jurisdiction may

be properly obtained through the parent-subsidiary relationship.

In *Velandra,* the plaintiffs sued for damages sustained in an automobile accident caused by the defective brakes in a Renault automobile manufactured in France by an initial defendant, Regie, and imported into the United States by a second defendant, Renault, before ultimate sale to the plaintiffs in Ohio. 336 F.2d at 295. Plaintiffs urged that the defendants were amenable to suit in Michigan because Regie, the manufacturer, owned 100% of the stock of Renault, the importer, and Renault, in turn, owned 100% of the stock of Great Lakes, the Michigan distributor. *Id.* at 296. Rejecting plaintiffs' arguments, this court concluded that:

> [T]he ownership of the [Great Lakes] subsidiary carrying on local activities in Michigan represents merely one contact or factor to be considered in assessing the existence or non-existence of the requisite minimum contacts with the State of Michigan, *but is not sufficient of itself to hold the present foreign corporations amenable to personal jurisdiction.*

*Id.* at 297 (emphasis added).

To resolve such personal jurisdiction issues, this court initially relied upon the early case of *Cannon Mfg. Co. v. Cudahy Packing Co.,* 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925), where the Supreme Court held that the activities of a subsidiary did not subject its parent corporation to the personal jurisdiction of a local court. *See id.* at 337, 45 S.Ct. at 251. We subsequently distinguished the *Cannon* rule in our *Velandra* decision, explaining that foreign parent corporations have been properly held amenable to the "personal jurisdiction of local courts because of the local activities of subsidiary corporations upon the theory that the corporate separation is fictitious, or that the parent has held the subsidiary out as its agent, or ... that the parent exercised an undue degree of control over the subsidiary." *Velandra,* 336 F.2d at 296 (citations omitted). *See also Nixon v. Celotex Corp.,* 693 F.Supp. 547, 551 (W.D.Mich.1988) (following *Velandra*

to conclude that foreign parent corporation's active participation in local subsidiary's personnel, pension and sales decisions justified exercise of specific jurisdiction over parent).

In the aftermath of our *Velandra* decision, the Fifth Circuit has consistently ruled that so long as a parent corporation and its subsidiary maintain separate and distinct corporate entities, the presence of one in a local forum may not be attributed to the other. *See, e.g., Bearry v. Aircraft Corp.,* 818 F.2d 370, 372–73 (5th Cir.1987).

In *Southmark Corp. v. Life Investors, Inc., and USLICO Corp.,* 851 F.2d 763 (5th Cir.1988), the plaintiff contended that even though defendant USLICO had no offices, real property, bank accounts, advertisements, employees, or service providers in Texas, USLICO was, nonetheless, amenable to suit in Texas. Plaintiffs argued that "USLICO's subsidiaries that do business in Texas are alter egos or agents of USLICO and that the general jurisdiction that Texas courts have over the subsidiaries may be imputed to USLICO." *Southmark Corp.,* 851 F.2d at 773. The Fifth Circuit, however, rejected plaintiff's contentions and accepted the district court's findings that USLICO's subsidiaries: (1) kept separate books and bank accounts; (2) filed income tax returns separate from USLICO; (3) were managed by separate boards of directors that had overlapping, but not identical, memberships with USLICO; and (4) were centrally managed by the officers of the largest USLICO subsidiary, but not the officers of USLICO. *See id.* at 773. Thus, the Fifth Circuit held that where "a wholly owned subsidiary is operated as a distinct corporation, its contacts with the [local] forum cannot be imputed to the [foreign] parent. Since USLICO has no other systematic and continuous contacts with Texas, we conclude that general jurisdiction does not exist." *Id.* at 773–74. *See also Hargrave v. Fibreboard Corp.,* 710 F.2d 1154, 1160 (5th Cir.1983) (demanding "proof of control by the parent over the internal business operations and affairs of the subsidiary in order to fuse the two for jurisdictional purposes.").

After evaluating these principles of law and the contentions of the parties, I would emphasize and apply this court's *Velandra* rule: where the "corporate separation is fictitious," jurisdiction may be properly obtained through the parent-subsidiary relationship. *Velandra*, 336 F.2d at 296. I would then update and refine the *Velandra* rule, holding that a plaintiff seeking to establish jurisdiction over a defendant foreign parent corporation by virtue of jurisdiction over its local subsidiary must prove: (1) *attribution*, "that the absent parent instigated the subsidiary's local activities;" or (2) *merger*, "that the absent parent and the subsidiary are in fact a single legal entity." Brilmayer & Paisley, *Personal Jurisdiction and Substantive Legal Relations: Corporations, Conspiracies, and Agency*, 74 Calif.L.Rev. 1, 12 (1986).

In the present case, I am persuaded that WEDGE, the foreign corporate parent, failed to operate TRC, its subsidiary doing business in the local forum, as a distinct legal entity. For jurisdictional purposes, I would define the alleged separate legal relationship between WEDGE and TRC as entirely fictitious. *See Velandra*, 336 F.2d at 296. Thus, in my opinion, because WEDGE effectively consummated a *merger* with TRC, traditional notions of fair play and substantial justice are not offended by holding WEDGE accountable for TRC's conduct in Tennessee, the local forum. *See Rush v. Savchuk*, 444 U.S. 320, 327, 100 S.Ct. 571, 576, 62 L.Ed.2d 516 (1980); *Southmark Corp.*, 851 F.2d at 773–74; *Velandra*, 336 F.2d at 296; Brilmayer & Paisley, *supra*, at 12. *Cf. Nixon*, 693 F.Supp. at 551 ("There may be some situations where a subsidiary could not be considered an agent or alter ego under corporate law, but it would nonetheless be fair to subject the parent to jurisdiction for some [of] its subsidiary's activities.").

Because WEDGE failed to maintain a corporate identity separate from TRC, the record provides ample justification for Tennessee to obtain jurisdiction over WEDGE by virtue of its undisputed jurisdiction over TRC. First, WEDGE did not maintain financial records, bank accounts or corporate assets separate from those of TRC. Instead, to induce Third National to restructure its loans to TRC, WEDGE contributed $7.5 million to TRC, in exchange for TRC stock, to be treated as TRC capital. In addition, WEDGE established a new account, on behalf of TRC, at Third National's Nashville, Tennessee branch. *Compare Hargrave*, 710 F.2d at 1160 (declining to find jurisdiction over corporate parent through its subsidiary where separate bank accounts, budgets and financial records were kept to maintain separate corporate identities). Second, WEDGE failed to file federal income tax returns separate from those filed by TRC. Upon review of the TRC–WEDGE Tax Sharing Agreement, the magistrate found that WEDGE obtained a written agreement from TRC that they would file a joint tax return. Moreover, the agreement stated that WEDGE would obtain the tax benefits in Tennessee. *Compare Southmark Corp.*, 851 F.2d at 773 (declining to find jurisdiction over corporate parent through its subsidiary where separate federal income tax returns were filed). Third, WEDGE failed to maintain corporate officers different from those of TRC. The magistrate found that the President and Executive Vice President of WEDGE entered into negotiations with Third National to secure additional credit for TRC. During the course of the negotiations, Third National was assured that the WEDGE officers would control the disbursement of TRC funds and would remain actively involved in the management TRC. *Compare Hargrave*, 710 F.2d at 1160 (declining to find jurisdiction through the parent-subsidiary relationship where the two companies were independently managed and shared no common officers).

On these relevant facts, I conclude that the corporate separation between WEDGE and TRC was fictitious. Thus, because the present action concerns TRC's Tennessee conduct, which WEDGE controlled, WEDGE should be held accountable for TRC's contacts in Tennessee. Accordingly, I concur in the result reached by the majority.