## TRANSPORTATION COMMUNICATIONS INTERNATIONAL UNION, et al., Plaintiff,

v.

## SULTRAN LTD., et al., Defendant.

### No. CIV.01–71427.

United States District Court, E.D. Michigan, Southern Division.

Feb. 20, 2002.

Joseph Guerrieri, Jr., Guerrieri, Edmond, et al., Washington, DC, I. Mark Steckloff, Sachs Waldman, Detroit, MI, for plaintiff.

Matthew E. Wilkins, Amy K. Hunt, John E. Benko, Butzel Long, Detroit, MI, for defendant.

## OPINION AND ORDER AS TO SPECIFIC PERSONAL JURISDICTION

FEIKENS, District Judge.

### Introduction

Transportation Communications International Union ("Trans Com"), representing over one hundred former employees of PDS Rail Car Services (USA) ("PDS USA"), filed suit against its former employer and parent corporation for violation of certain federal statutes arising from their failure to pay wages and benefits. Parent corporation Sultran Ltd. ("Sul-

tran") filed this motion to dismiss for lack of personal jurisdiction.

## Background

Defendant Sultran is a Canadian sulphur transport and logistics company based in Calgary, Alberta.[1] As part of its operations, Sultran owns a fleet of approximately 1300 railcars that require periodic maintenance.

On July 27, 1989, the Sultran Board of Directors approved the establishment of PDS Rail Car Services Corporation ("PDS Canada") to operate a railcar maintenance and repair facility in Calgary to lower the cost of railcar maintenance and reduce the maintenance turnaround time by giving priority to Sultran cars. Even though Sultran was only a 45% shareholder at the time, it had acquired 90% of the shares by August 1991.

On September 21, 1995, officers of PDS Canada incorporated PDS USA in the State of Delaware. PDS USA was incorporated to take over operation of a railcar repair shop in Port Huron, Michigan, previously run by Grand Trunk Western Railroad ("GTW"). To attract employees of GTW to leave their employment and join the upstart PDS USA, PDS Canada offered five year employment contracts to carmen employed by the GTW.

To secure financing for PDS USA, Sultran guaranteed loans made to PDS Canada to fund PDS USA's operations. On June 26, 1997, Sultran entered into a financial commitment with the Canadian Imperial Bank of Canada ("CIBC") for the benefit of PDS USA. The financing commitment initially provided for issuance of a $1 million U.S. Letter of Credit to the National Bank of Detroit ("NBD") in Michigan as partial security on NBD's $3 million U.S. bank facility to fund PDS USA's

operations. In 1998, Sultran increased the Letter of Credit to $2 million U.S.

Although PDS USA itself did not perform maintenance work on Sultran railcars, the Port Huron operation was intended to fulfill the "PDS Mandate" of providing the lowest possible maintenance costs to its shareholders. Pl.App. 175. In order for PDS to continue to provide low-cost repairs to Sultran, the company had to generate a critical mass of $14 million in revenue. Pl.App. 177. PDS USA, along with PDS Canada's Calgary and Winnipeg plants, were part of the PDS mandate to reach that critical mass.

Sultran officers and directors simultaneously served as directors for PDS Canada and PDS USA. Their salaries were fully paid by Sultran, and they met periodically in Port Huron at Sultran's expense. Chief among them is Lorne Friberg, who served simultaneously as President and Director of Sultran and as Chairman of the Board for both PDS Canada and PDS USA.

From the outset of PDS USA's operations in 1997, PDS Canada transferred money to PDS USA on a monthly basis. None of these transfers was subject to any formal loan documentation, repayment terms, or interest charges. Despite these steady infusions of cash, PDS USA incurred losses of $616,189 in 1997. By September, 1998, PDS USA had become "dependent on PDS [Canada] for financing day-to-day activities." Pl.App. 340

After considering closing the PDS USA shop, Sultran decided instead to try to turn it around. In December, 1998, Sultran contracted with Pricewaterhouse-Coopers ("PwC") of Canada to head the turnaround effort by serving as interim managers of PDS USA. The PwC consul-

---

1. Besides owning approximately one hundred railcars in the U.S. which are leased to other entities, Sultran does not own other property,

conduct business, or retain employees in the U.S.

tants worked on-site in Port Huron and Sultran management was "actively informed and involved in this recovery program." Pl.App. 356

As part of the turnaround effort, Sultran made a series of cash transfers totaling over $700,000 U.S. to PDS USA through PDS Canada between 2000 and 2001 to sustain PDS USA's ongoing operations. These transfers were made by Friberg as President of Sultran and not by the Board of Directors of PDS Canada or Sultran. These cash transfers between Sultran and PDS Canada provided no repayment terms, no interest charges, and were never repaid.

However, the turnaround effort proved unsuccessful. Despite early signs that PDS USA was recovering, an audit in January revealed a large discrepancy between the reported and actual loss. PDS USA had lost $660,000 instead of the originally reported $58,000.

On February 22, 2001, PDS USA executed a Line of Credit Agreement with Bank One (Formerly NBD). The Agreement stated that PDS USA may be required to submit, among other things, annual audits of Sultran and Sultran's quarterly financial statements. Pl.App. 508.

By early March, 2001, PDS USA was again experiencing a serious cash shortage. Friberg requested a loan from the Sultran Board on behalf of PDS Canada to enable PDS USA to continue its operations. The loan was denied, and as a result, PDS USA closed down on March 8, 2001.

In April, 2001, the Transportation Communications International Union, representing the dismissed carmen, filed suit in this court for breach of contract, citing additionally violations of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 et seq., Consolidated Omnibus Budget Reconciliation Act ("CO-BRA"), 29 U.S.C. § 1161 et seq., Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq., and Worker Adjustment and Retraining Notification Act ("WARN Act"), 29 U.S.C. § 2101 et seq.

On July 13, 2001, Sultran filed a motion to dismiss for lack of personal jurisdiction. For the reasons below, I find that Sultran is subject to this court's specific personal jurisdiction and deny Sultran's motion to dismiss.

### Issues

Whether this court has specific personal jurisdiction over Sultran for Trans Com's cause of action.

### Analysis

#### Standard of Review

In reviewing a motion to dismiss for lack of specific personal jurisdiction without an evidentiary hearing, plaintiff "needs only make a prima facie showing of jurisdiction to survive the motion." *Dean v. Motel 6 Operating L.P.*, 134 F.3d 1269, 1272 (6th Cir.1998) (citations omitted). The court should view the evidence "in a light most favorable to the plaintiff" and "not weigh the controverting assertions of the party seeking dismissal." *Id.* However, if there is no "real dispute" as to the facts, plaintiffs must prove jurisdiction by a preponderance of the evidence. *Id.*

In this case, although Sultran insists that there is no real dispute, it nonetheless challenges plaintiffs' interpretation of the facts. Def. Brief at 12 (claiming that plaintiffs' assertions are "factually inaccurate."), 16 (contending that plaintiffs' reading of the Letter of Credit to CIBC is a "misstatement of undisputed facts.") Therefore, I conclude that there is a real dispute and interpret the evidence in favor of the plaintiffs.

*Specific Personal Jurisdiction*

The Supreme Court has held repeatedly that

> due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."

*International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 342, 85 L.Ed. 278 (1940)). The critical question "minimum– contacts" analysis seeks to answer is whether "the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 569, 62 L.Ed.2d 490 (1980).

In analyzing the due process limits of personal jurisdiction, a distinction is made between "general jurisdiction" and "specific jurisdiction." *See Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528. In a case of general jurisdiction, a defendant's contacts with the forum state are of such a "continuous and systematic" nature that the state may exercise personal jurisdiction even if the action is unrelated to the defendant's contacts with the state. *See e.g. Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952). In a specific jurisdiction case, "a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 414 n. 8, 104 S.Ct. 1868, 1872 n. 8, 80 L.Ed.2d 404 (1984). In this case, Sultran's contacts with Michigan are not of a "continuous and systematic" nature such that Michigan could maintain personal jurisdiction over Sultran in an action unrelated to its Michigan contacts. Thus, personal jurisdiction, if it exists, must be specific jurisdiction.

In *Southern Machine Co. v. Mohasco Industries, Inc.* 401 F.2d 374 (6th Cir.1968), the United States Court of Appeals for the Sixth Circuit set forth a three-part test for determining whether, consistent with due process, personal jurisdiction may be satisfied:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

401 F.2d at 381. *See also Third National Bank in Nashville v. WEDGE Group Incorporated,* 882 F.2d 1087, 1090 (6th Cir. 1989); *Dean, supra* at 1273 (6th Cir.1998). Analyzing the present case under the three *Southern Machine* criteria, I conclude that I have specific jurisdiction over Sultran.

*I.   Purposeful Availment*

The first *Southern Machine* criterion requires that the defendant must "purposefully availed itself of the privilege of acting in the forum state or causing a consequence in the forum state." The "purposeful availment" requirement

> ensures that a defendant will not be haled into a jurisdiction as a result of "random," "fortuitous," or "attenuated" contacts, *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 1478, 79 L.Ed.2d 790 (1984) *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 299, 100 S.Ct. 559, 62 L.Ed.2d 490, or of the "unilateral activity of another

party or a third person," *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417, 104 S.Ct. 1868, 1873, 80 L.Ed.2d 404. Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant himself that create a "substantial connection" with the forum State. *McGee v. International Life Insurance Co.*, 355 U.S. at 223, 78 S.Ct. 199 at 201, 2 L.Ed.2d 223; see also *Kulko v. California Superior Court*, 436 U.S. at 84, 94 n. 7, 98 S.Ct. 1690, 1698 n. 7, 56 L.Ed.2d 132.

*WEDGE Group, supra,* at 1090 (citing *Burger King, supra* at 475, 105 S.Ct. 2174)

In *WEDGE Group*, a Tennessee bank (Third National), sued a Texas parent corporation (WEDGE) in Tennessee for the debt of the parent's wholly-owned Tennessee subsidiary (TRC). WEDGE, the Texas parent, moved to dismiss for lack of personal jurisdiction. In finding that WEDGE purposefully availed itself in Tennessee, the Sixth Circuit considered, among other things,

> [f]irst, from 1978 to 1986, WEDGE was the 100% owner of TRC, a corporation that, along with its own subsidiaries, conducted business in Tennessee. Second, WEDGE was not a mere passive owner of TRC; from 1982 to 1986 WEDGE officers served as TRC directors and met regularly—as often as monthly—in Tennessee to review and direct TRC's operations.... Fourth, in 1985, WEDGE officers participated in negotiations between Third National and TRC regarding the Third National–TRC third amended loan agreement, and, in order to induce Third National to enter the amended loan agreement, WEDGE deposited $7.5 million in a checking ac-

count maintained at a Third National branch in Tennessee....

*WEDGE Group* at 1090.

■ Many of the WEDGE Group factors are also present here. First, PDS USA is a Sultran subsidiary that conducts business in Michigan. Second, Sultran was not a mere passive owner, but was actively involved in directing the operations of PDS USA. Sultran board members served simultaneously as PDS USA directors, met regularly in Port Huron to review and direct PDS USA operations, and were compensated and reimbursed for travel expenses solely by Sultran. *See also Dean* at 1275 ("network of simultaneous board memberships can support finding of jurisdiction."). Moreover, Sultran hired PwC consultants to serve as interim managers in Port Huron, and were "actively involved in the recovery program." Third, like WEDGE, Sultran was deeply involved in obtaining PDS USA's financing by extending a Letter of Credit for $2 million U.S. to NBD for PDS USA, and was part of PDS USA's February, 2001 Line of Credit agreement with Bank One, which required PDS USA to submit Sultran's quarterly financial reports and annual audits.[2] Fourth, Sultran infused over $700,000 in cash to PDS USA through PDS Canada without interest or repayment terms.

Examining all these factors, I find that Sultran "purposefully availed" itself of acting in Michigan and that its contacts with the state were not "random," "fortuitous," "attenuated," nor the result of "the unilateral activity of another party."

## II. Arising Out of

The second *Southern Machine* requirement is that "the cause of action must

**2.** While Sultran is correct that the "unilateral activity" of a third party does not give rise to jurisdiction. I think the Bank One Line of Credit Agreement, when interpreted in favor of the plaintiffs, shows that Sultran was actively securing PDS USA's credit and finances.

arise from the defendant's activities" in Michigan. *Dean, supra* at 1275. This does not require the cause of action to arise directly and formally, only that the cause of action "have a substantial connection with the defendant's in-state activities." *Id.* In other words, "only when the operative facts of the controversy are not related to the defendant's contact with the state can it be said that the cause of action does not arise from that contact." *Id.* (quoting WEDGE Group).

■ Sultran contends that because it did not negotiate the union contract and did not affirmatively close down PDS USA, the cause of action did not "arise from" Sultran's activities in Michigan. Defendant's brief at 10. Sultran argues that the "arising out of" inquiry focuses on specific "time periods" that give rise to the cause of action and the court should ignore all other contacts that fall outside of these time periods. In this case, Sultran contends, the inquiry should center around the time of the union contract signing and when PDS USA declared bankruptcy.

Sultran's argument is unpersuasive. The "arising out of" requirement is not so narrow as to require this court to confine the inquiry to certain "time periods." Instead, the inquiry is directed at the totality of Sultran's contacts with Michigan and whether they are "substantially related" to the plaintiffs's causes of action. *See WEDGE Group* (court examined the totality of defendant's contacts with the subsidiary in Tennessee to find personal jurisdiction).

Examining the totality of Sultran's contacts with Michigan, it becomes clear that plaintiffs' causes of action do arise from Sultran's contacts. PDS USA, from its inception, was dependent on Sultran for all of its Michigan credit and banking arrangements. Sultran provided a Letter of Credit to NBD for $2 million U.S. When Sultran decided to engage in the turnaround effort, Sultran transferred over $700,000 U.S. via PDS Canada to fund its day-to-day operations and sent PwC consultants to act as interim managers. Put a different way, the union contract would not have happened without Sultran's initial financial support. Lastly, after funding PDS USA's operation for over three years, Sultran determined not to extend further funds to PDS USA and caused PDS USA to close down, thus giving rise to Trans Com's cause of action.

### III. Reasonableness

The final *Southern Machine* requirement is that "the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *WEDGE Group* at 1092. This requirement involves "a determination of whether the [forum state] has an interest in resolving the conflict at issue." *Id.*

However, the interest of the forum state must be balanced against the burdens of a foreign corporation in trying the case in a foreign jurisdiction. *See Asahi Metal Industry Co., Ltd. v. Superior Court of California, Solano County*, 480 U.S. 102, 114, 107 S.Ct. 1026, 1033, 94 L.Ed.2d 92, 105 ("The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders.") (1987).

■ In this case, Michigan and the United States have a strong interest in seeing that its citizens are compensated by their employer and that federal laws are complied with. Moreover, even though Sultran is a foreign corporation, it has not demonstrated that it will be unfairly burdened in defending this case in Michigan. Sultran officers have traveled to Michigan

for various meetings, and Sultran did not have difficulty in sending consultants to Michigan to manage PDS USA during the turnaround effort.

Lastly, Sultran contends that because this court will have to adjudicate Canadian law, it would be unreasonable for this court to find jurisdiction. In support, they cite the Restatement (Second) of Conflict of Laws § 307 (1971) ("The local law of the state of incorporation will be applied to determine the existence and extent of a shareholder's liability to the corporation for assessments or contributions and to its creditors for corporate debts.") Sultran's counsel acknowledged during the hearing on February 5, 2002, that it is unclear which law would apply, and I am unwilling to deny jurisdiction on the factor of having to apply Canadian law.

### Conclusion

For the foregoing reasons, I find that this court has personal jurisdiction over Sultran and Sultran's motion to dismiss for lack of personal jurisdiction is DENIED. **IT IS SO ORDERED**.