Nelson Bunker HUNT, Plaintiff,

v.

MOBIL OIL CORPORATION et al.,
Defendants.

No. 75 Civ. 1160.

United States District Court,
S. D. New York.

Oct. 15, 1975.

See also, D.C., 410 F.Supp. 10.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiff; Jay H. Topkis, Daniel P. Levitt, Anthony M. Radice, Paul D. Wexler, New York City, Philip J. Hirschkop, Philip Hirschkop & Associates, Ltd., Alexandria, Va., of counsel.

Windels & Marx, New York City, for defendant Gelsenberg Aktiengesellschaft; Paul Windels, Jr., John J. Hayes, Roger I. Harris, Stuart A. Hoberman, New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

This action was instituted by plaintiff, an independent oil producer with an interest in oil fields in Libya, against the seven largest oil producers of the world and three independents, including the defendant Gelsenberg Aktiengesellschaft ("Gelsenberg"). Centering upon an agreement entered into on January 15, 1971 by the parties to this litigation ("Libyan Producers Agreement" or "Agreement"), the complaint charges the defendants with antitrust violations upon various claims and also with breach of the Agreement.

Gelsenberg moves to dismiss the complaint on the grounds that, as to it, (1) the court lacks jurisdiction; (2) venue in this district is improper; and (3) process and service of process was insufficient.

Gelsenberg is a West German corporation with its principal place of business in Essen. Gelsenberg's business, aside from any dealings related to the Libyan Producers Agreement, is conducted wholly outside the United States. Thus, the basis for this court's jurisdiction, if any, must be found in the contacts which Gelsenberg had in New York within this district in connection with the Agreement.

Upon the complaint and affidavits submitted on this motion, including those offered by defendant Gelsenberg, it is beyond cavil that the Libyan Producers Agreement, negotiated in the main in this district, was of vital concern to each of the parties thereto. The Agreement reflected a unified effort to resist constantly increasing demands made upon the defendants by the Libyan and Persian Gulf oil producing countries who were members of the Organization of Petroleum Export Countries ("OPEC"). The latter organization represented the combined force of all the major oil producing governments in the Middle East, North Africa, Venezuela and Indonesia. To bolster the united front negotiating stance contemplated by the Agreement, a support provision was incorporated under which oil would be supplied by those parties with Persian Gulf sources to any party whose supply was cut off by the Libyan government. This provision was particularly important to Gelsenberg because Gelsenberg was an independent Libyan producer.

Gelsenberg's representatives, Dr. Enno Schubert, a member of its Executive Board, and Dietrich von Auwers, a senior staff member, travelled from its headquarters in Essen, Federal Republic of Germany, to New York City, where, on January 14, 1971, they joined a meeting already in progress for some days prior thereto, during which the terms of the proposed Agreement had been exhaustively negotiated by the participants. Gelsenberg's representatives there received the final draft of the "Libyan Producers Agreement," which obviously was examined and considered by them, and which Dr. Schubert signed the next day in Washington, D.C. on behalf of Gelsenberg.

While Gelsenberg urges that its presence in this district and the activities of its representatives on January 14, 1971 were minimal, there were other

contacts and activities in this district thereafter directly related to the Agreement and its implementation. Thus, although the original Agreement was not executed by Gelsenberg in New York, three related memoranda which subsequently reaffirmed and amplified upon the provisions contained therein were signed by Gelsenberg's representative in New York City. On October 18, 1971, in New York City, Gelsenberg entered into a Memorandum of Intent with the other parties to the original Agreement which, in effect, renewed the parties' commitment to "consider collectively the responses to be made to the [oil producing] government's demands."

At the same meeting, Gelsenberg's representative also signed a Memorandum of Confirmation which was crucial to Gelsenberg's business interests as a producer whose sole source of oil was in Libya because the purpose of this memorandum was to specify that certain activities of the Libyan government would activate the original Agreement and, in turn, the supply provision under which Gelsenberg was to receive Persian Gulf oil if its Libyan supply was cut off. This supply mechanism was of vital interest to Gelsenberg as a Libyan oil concessionaire. It sent its representative back to New York City on December 16, 1971 to execute a Further Memorandum of Confirmation, which incorporated into the original Agreement any

"total or partial nationalization of the properties of any party hereto by the Libyan Government in contravention or breach of the applicable provisions of the Petroleum Law or the terms of any of the concession agreements of such party . . . ."

In addition to the execution of such Memoranda relating to the Agreement, various meetings were conducted in New York City to consider implementation and administration of the basic agreements. There were many such meetings and no contention is made that Gelsenberg attended all. However, Gelsenberg freely admits "the presence of its representatives at occasional meetings in New York." Gelsenberg does not deny, as plaintiff alleges, that Gelsenberg representatives attended at least fifteen meetings in New York between January 25, 1971 and September 6, 1973, all of which pertained to implementation or administration of the Libyan Producers Agreement. The details of some of these meetings indicate the vital concern which Gelsenberg had with such dealings in New York.

In early March 1971, in New York City, Gelsenberg's representative, Dr. Schubert, who was a member of the Tripoli Negotiating Team, previously appointed to further the interests of the parties to the Agreement, reported the results of the Team's negotiations with the Libyan government.

Another meeting was held at New York City on October 11, 1971 of the London Administrative Group, of which Gelsenberg was a member. Its representatives, Dr. Schubert and von Auwers, participated in that meeting. The subject matter was the Libyan Producers Agreement and the renewed demands by OPEC as to which the participants agreed that "full consideration should be given to the question whether concerted industry action was needed in order effectively to resist the demands in respect of currency parities which amounted to demands for increases in the companies' payment." [1] A study group was appointed to consider these demands and to make recommendations on enumerated items, including "whether common action by the companies was needed." A representative of Gelsenberg was a member of the study group.

In addition, according to the affidavit of Mr. von Auwers submitted on behalf of Gelsenberg, a Gelsenberg representative participated in New York in October 1972 in the work of an ad hoc committee established under the Libyan Producers Agreement. The function of this committee was to gather facts and

---

1. McCloy letter to Assistant Attorney General, Antitrust Division, dated October 15, 1971.

data for use by the negotiating teams in their deliberations with the Libyan government.

The general nature of the activities of representatives of the signatories to the Agreement is described by John J. McCloy, who acted as counsel for all the parties in obtaining clearances from the Department of Justice with respect to their concerted activities. In a letter to the Assistant Attorney General, United States Department of Justice,[2] in detailing these activities, many of which took place within this district, he summed it up: "From time to time, when important questions of policy needed to be resolved, meetings of the chief executives of the companies involved were held in New York and London."

Finally, Dr. Ewald Schwarz, another representative of Gelsenberg, acknowledges that he attended six meetings of the Libyan Emergency Supply Subcommittee (LESSCOM), which were held at various times in New York City. LESSCOM was an organization set up within this district, which plaintiff asserts was a clearing house for carrying out the terms of the Libyan Producers Agreement with respect to the transfer and sale of oil. LESSCOM functioned together with the accounting firm of Price, Waterhouse & Company and the First National City Bank, both located within this district. Gelsenberg challenges plaintiff's description of LESSCOM's operations in the implementation of the Agreement. However, the affidavit of Dr. Schwarz, submitted by defendant in support of its motion, indicates that LESSCOM was an important cog employed by the parties to the Agreement, including Gelsenberg, in effectuating the rights of the parties thereto with respect to replacement oil owed to and from one another.

Dr. Schwartz states that LESSCOM acted "to compute the entitlements and obligations under the Agreement of the parties for such comment or action as each party saw fit to pursue. LESSCOM's staff kept all signatories informed of its computations as to individual obligations and entitlements and kept records thereof." When Gelsenberg supplied crude oil to another signatory, it sent its invoice to Price, Waterhouse, which periodically billed the company purchasing oil, including in one invoice the charges of Gelsenberg, as well as those of others entitled to payment for shipments. Payments by Gelsenberg for oil received by it from a signatory to the Agreement were made to First National City Bank here in New York City for the LESSCOM account managed by Price, Waterhouse. Payments due to Gelsenberg were made from funds in that account and transmitted to it in Essen, West Germany.

The structured organization of LESSCOM, Price, Waterhouse and First National City Bank was used by all the parties to the Agreement to carry out one of its purposes. While defendant prefers to refer to it as "merely a mechanical service which could have been provided in any metropolitan center," a more realistic description is that it was the nerve center which radiated out to the various parties to give vitality to their Agreement to effectuate one of its basic purposes. Dr. Schwarz's attendance at the six meetings of LESSCOM concerned not only the Agreement, its administration and implementation, but necessarily the protection of Gelesenberg's interests. Thus, he states that at three of the meetings his assignment was "to observe and check the manner in which entitlements and obligations were calculated and to report back to [his] su-

---

2. Letter of July 23, 1971, to Assistant Attorney General Richard W. McLaren. The reference by movants' counsel that Mr. McCloy's letter is "unsworn" is frivolous in view of the fact that he represented all the sig-natories to the Agreement, including Gelsenberg, before the Department of Justice. The letter itself was a report requested by the Department.

periors in Essen." The entitlements and obligations on which he checked at LESSCOM were indeed substantial. As of April 30, 1974, Gelsenberg received 5,308,000 barrels of Persian Gulf crude oil under the sharing provisions of the Agreement. Gelsenberg supplied 4,317,000 barrels of Libyan crude oil under its provisions. Payments and receipts for those transactions, running into many millions of dollars, were made through the First National City Bank in New York. The fact that the crude oil was delivered f.o.b. at foreign distribution centers in no wise detracts from the activities carried on here which resulted in deliveries abroad purportedly pursuant to the terms of the Agreement.[3]

■ Gelsenberg urges that the attendance of its representatives in New York City was at the behest of and "on the basis of convenience for all others concerned and had nothing to do with Gelsenberg's business activities . . ." Even accepting as fact that Gelsenberg's representatives accommodated others, it does not follow that their acts performed while here "had nothing to do with Gelsenberg's business activities." The motive that brought them here is irrelevant to the issue of jurisdiction. It is what they did that is relevant. The hard fact is that, as the above recital of their activities reflects, Gelsenberg's representatives and agents were here on matters of vital interest to its welfare and they performed acts in furtherance of its business interests.

■ In sum, the record before this court on this motion, which reflects only some but not all of Gelsenberg's activities in this district in advancing its corporate interests, makes out a compelling case that it is subject to in personam jurisdiction in this district and that venue here also is proper as to it. This is so, whether its activities are tested by applicable criteria under section 12 of the Clayton Act,[4] or New York's long arm statute.[5] Under either standard the totality of the defendant's contacts and acts in this district in the furtherance of its vital business interests were meaningful, continuous and substantial.[6] The reality of the situation leaves no room to doubt that defendant was present in this district by its officers and agents transacting business of the corporation of a substantial character.[7] All their activities, extending over a three-year period, had a direct relationship to the execution, implementation and administration of the Libyan Producers Agreement and subsequent agreements, which are at the center of the various claims alleged against the defendant. The vehement denials by de-

3. *Gelfand v. Tanner Motor Tours, Ltd.*, 385 F.2d 116, 121 (2d Cir. 1967), *cert. denied*, 390 U.S. 996, 88 S.Ct. 1198, 20 L.Ed.2d 95 (1968); *Goldberg v. Southern Builders, Inc.*, 87 U.S.App.D.C. 191, 184 F.2d 345, 348 (1950); *Pickthall v. Anaconda Copper Min. Co.*, 73 F.Supp. 694, 697 (S.D.N.Y.1947).

4. 15 U.S.C. § 22, which provides:
    "Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found."

5. N.Y.C.P.L.R. § 302(a)(1), which provides:
    "*Acts which are the basis of jurisdiction.* As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nondomiciliary, or his executor or administrator, who in person or through an agent: 1. transacts any business within the state; . . ."
    Since jurisdiction under the New York law is based upon the transaction of business, it is unnecessary to consider plaintiff's further contention that jurisdiction may also be grounded upon the "tortious act," subdivision (2) of § 302(a).

6. *See United States v. Scophony Corp.*, 333 U.S. 795, 810, 68 S.Ct. 855, 92 L.Ed. 1091 (1948); *Sterling Nat'l Bank & Trust Co. of N. Y. v. Fidelity Mortgage Investors*, 510 F.2d 870, 873–74 (2d Cir. 1975); *Liquid Carriers Corp. v. American Marine Corp.*, 375 F.2d 951, 955–56 (2d Cir. 1967).

7. *Cf. Eastman Kodak Co. of N. Y. v. Southern Photo Materials Co.*, 273 U.S. 359, 371, 47 S.Ct. 400, 71 L.Ed. 684 (1927).

fendant of plaintiff's charges of conspiratorial conduct while its representatives were present in this district (or elsewhere) are, of course, irrelevant on the issue of jurisdiction. Gelsenberg's contacts with this jurisdiction were so pervasive as to foreclose any constitutional claim based upon the absence of "minimum contacts." [8]

■ The defendant next challenges process and service of process upon it in West Germany. The claim is without substance. Service was made upon Gelsenberg as a *foreign corporation in compliance* with Rule 4(i)(1)(D) of the Federal Rules of Civil Procedure. The Rule provides that where there is a basis for jurisdiction over a defendant in a foreign country service can be made "by any form of mail, requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the party to be served." The Clerk of this Court, to perform his function under that Rule, provides a set of instructions to attorneys who seek to effect process upon foreign litigants. This requires the attorney to provide the Clerk with an envelope, postage, return receipt card and a copy of the summons and complaint to be served. In the instant case the Clerk computed the postage due (for which plaintiff reimbursed him), placed the postage on the envelope himself and performed the actual mailing by registered mail. Thus there was strict and literal compliance with the Rule. However, Gelsenberg complains that the envelope in which the summons and complaint were enclosed and mailed to the defendant should have been an official envelope of the Clerk of the Court; that the Clerk's address should have appeared and that a covering letter or some special notice directed to the defendant explaining the importance of the documents. The defendant acknowledges the Rule contains no such requirements, but argues the Rule provides "that . . .

mailing be addressed and dispatched by the Clerk to the party to be served" and that this implicitly requires the Clerk to use official stationery; also the defendant argues that implicit in the Rule is a requirement that when "the party" is a corporation the envelope be addressed to the attention of an officer and that reasonable precautions must be taken to insure the communication will reach an officer authorized to accept service. There is no basis for this tortured twisting of the plain language of the Rule. Defendant in effect seeks to rewrite the Rule. The means adopted under the Rule to effect service of process were reasonably and fairly calculated to advise the defendant of the commencement of the suit. The envelope and its contents sent by registered mail as provided for by the Rule were received by defendant as evidenced by the return receipt, as well as by its appearance in this action. It may be assumed that addressees of registered letters who receive and accept them will read them, especially so in the instance of large corporations engaged in annual transactions running into the many, many millions of dollars. The contention of lack of proper service borders on the frivolous.

■ The defendant makes a further claim that the service constituted a violation of its right to due process of law. Here it contends that the summons and complaint should have been translated into the German language so that the defendant could have been made aware of the seriousness of plaintiff's charges, as set forth in the complaint. This claim, too, is lacking in substance, particularly with respect to this defendant. It is a multi-national corporation; its representatives negotiated the contract in this district in the English language and executed the basic as well as the supplementary agreements in English.

■ Finally, based upon the opinion of a legal expert as to German law,

---

8. *See Hanson v. Denckla*, 357 U.S. 235, 251, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *International Shoe Co. v. State of Washington*, 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945).

Gelsenberg contends that the court should abstain from entertaining this case against it because any judgment that may be entered in this action in favor of the plaintiff, in the light of the jurisdictional and service of process claims here advanced by the defendant, would not be recognized or enforced by the German courts. This is not a proper basis on which to abstain from entertaining this suit against Gelsenberg. Whether or not West Germany will recognize and give full faith and credit to a judgment of this court is a matter for it to decide if and when plaintiff may seek to enforce in West Germany any judgment which may be rendered in its favor. It may well be that should plaintiff prevail, it may not necessarily be compelled to effectuate the judgment in West Germany. There may be assets here available to be applied in satisfaction of the judgment.

The motion is denied in all respects.