**LYMAN STEEL CORP., et al., Plaintiffs,**

v.

**FERROSTAAL METALS CORP., et al., Defendants.**

**No. C88–2502.**

United States District Court, N.D. Ohio, E.D.

Aug. 15, 1990.

**390**

James T. Crowley, Karen E. Rubin, Thompson Hine & Flory, Cleveland, Ohio, for plaintiffs.

John E. Martindale, Pete C. Elliott, Benesch, Friedlander, Coplan & Aronoff, Cleveland, Ohio (Stephen E. Smith, Siemon, Larsen & Purdy, Chicago, Ill., of counsel), for defendants.

## MEMORANDUM AND ORDER

BATTISTI, District Judge.

After the ships transporting the custom ordered steel plates delivered only some, but not all of the goods, upon arrival at port Cleveland, Plaintiffs Lyman Steel Company ("Lyman") and Federal Insurance Company of New Jersey/Chubb Insurance ("Chubb") filed this diversity action on July 14, 1988 alleging causes of action for conversion and breach of contract and requesting compensatory and punitive damages. Defendants Ferrostaal Metals Corporation ("Ferrostaal U.S.A.") Franz Kirchfeld GMBH & Company ("Kirchfeld") and Ferrostaal, Aktiengesellschaft ("Ferrostaal of West Germany") have filed, pursuant to Fed.R.Civ.P. 12(b)(2) and (b)(4), Motions to Dismiss the Complaint for lack of personal jurisdiction, and to quash service of process over both Kirchfeld and Ferrostaal of West Germany.[1] For the following reasons, the Court DENIES the Motion to Dismiss for Lack of Personal Jurisdiction, and GRANTS the Motion to Quash Service of Process. Plaintiffs are GRANTED forty-five (45) days in which to perfect service under the provisions of the Hague Service Convention.

Lyman has properly pleaded diversity of citizenship; therefore, this court has sub-

---

1. Defendants' have been granted leave to file original affidavits contesting jurisdiction.

ject matter jurisdiction under 28 U.S.C. § 1332.[2]

## A. Facts.

Lyman engages in the business of "developing, purchasing, fabricating, warehousing, and ultimately, selling steel products to industrial users." Complaint at ¶ 1. Chubb is partially subrogated to the rights claimed by Lyman in this lawsuit. *Id.* at ¶ 2. In 1980, Lyman began developing a process by which *it could sell* "a unique abrasion-resistant steel plate ('AR plate')." *Id.*, at ¶ 7. (Emphasis supplied). By 1986—six years later—Lyman located a steel mill in Galatz, Romania that could produce AR plate to Lyman's specifications. Because of Romanian counter-trade requirements, Lyman could not book orders with the Galatz mill directly; instead, it structured the transaction through an intermediary, Kirchfeld, a designated counter-trading channel with Romania. *Id.*, at ¶ 7. Lyman booked an order with Kirchfeld, which in turn booked an order for AR plate made to Lyman's specifications with the Galatz, Romania mill. Lyman would pay Kirchfeld through a letter of credit opened by Lyman at an Ohio bank. *Id.* at ¶ 8. After the AR plate was produced and loaded onto a shipping vessel, Kirchfeld would present an invoice, bill of lading, and other required documents upon which, a corresponding bank in Dusseldorf, Germany, would pay Kirchfeld. Kirchfeld, pursuant to its counter-trading arrangements, would then compensate the Galatz mill. *Id.*

On December 12, 1986, Lyman and Kirchfeld entered into an agreement, "memorialized" in Lyman's telex to Kirchfeld dated December 13, 1986, for the production and purchase of Lyman's AR plate for 1987. *Id.*, ¶¶ 9–10 & Exhibit A ("Exh. A.") Under this agreement, Kirchfeld would procure a total 14,000 metric tons ("MT")

of AR plate in 1987, at specified times and places, in three orders: the first 2,000 MT would be shipped to an East Coast port in January, 1987; the second 6,000 MT would be shipped to Cleveland in March, 1987, by the time navigation in the Great Lakes opened; and the third, an option for 6,000 MT, to be shipped prior to the close of the Great Lakes shipping season. The first order of 2,000 was completed without incident; the steel was loaded on the vessel, M/V Aegeon in Romania on March 31, 1987 (apparently, a few months late); Kirchfeld invoiced Lyman, was paid $746,853.03 for 1,939.878 MT,[3] and Lyman received all of this steel. On January 12, 1987, Lyman submitted the second order for 6,000 MT of AR plate. The 6,000 MT was shipped from Galatz, Romania on two vessels: the M/V Mayombe, loaded with 1,662 AR plates (3,508.372 MT) in Romania around August 11, 1987 and the M/V Likouala, loaded with 1,335 AR plates (2,314.158 MT) in Romania around October 28, 1987. According to the allegations in the Complaint, all the steel cargo (with the exception of Lyman's AR plate) was consigned to Ferrostaal. *Id.*, at ¶ 11. This steel cargo "consisted of standard A–36 steel plate, a lower-grade plate than that ordered by Lyman." *Id.* Kirchfeld invoiced Lyman the sum of $1,368,265 for 1,662 AR plates, and the sum $886,-509.67 for the 1,355 AR plates. *Id.* at ¶ 11–13. When these vessels unloaded the AR plate in Cleveland, around September 4, 1987 and November 23, 1987, Lyman alleges that it did not receive all of the AR plate described on the bills of lading. There were 64 AR plates missing, which total 119.90 MT (18 pieces of the total 1,662 from the M/V Mayombe and 46 from the total 1,355 aboard the M/V Likouala). *Id.*, at ¶ 13. Lyman alleges that it notified the defendants that all the steel plate did not arrive. Kirchfeld and Ferrostaal of West

---

**2.** Plaintiff Lyman is an Ohio corporation with its principal place of business in Cleveland Ohio; Plaintiff Chubb is a New Jersey insurance company with its principal place of business in Warren, New Jersey. Complaint, ¶¶ 1–2. Defendant Ferrostaal U.S.A., a subsidiary of Ferrostaal of West Germany, is a California corporation within its principal place of business in San Mateo, California; Defendants Ferrostaal of

West Germany and Kirchfeld, are West German corporations with their principal places of business in Essen, Germany and in Dusseldorf, respectively.

**3.** Exhibit A states that the quantity is to be "8,000 MT (plus or minus 10 percent)." The 8,000 MT represents the first two installments.

Germany failed to account for these shortages and deliver the missing tonnage, despite Lyman's demand they do so. *Id.* at ¶ 14.

### B. Motion to Dismiss under Rule 12(b)(2).

#### 1. Prima Facie Burden

In both subject matter and personal jurisdiction, the party invoking federal jurisdiction ultimately bears the burden of affirmatively establishing its existence by a preponderance of the evidence. *McNutt v. General Motors Acceptance Corp. of Indiana,* 298 U.S. 178, 189, 56 S.Ct. 780, 785, 80 L.Ed. 1135 (1936); *Weller v. Cromwell Oil Co.,* 504 F.2d 927 (6th Cir.1974). Although a trial court has discretion to determine how to resolve a 12(b)(2) motion, the case law of this Circuit clearly "establishes a settled procedural scheme to guide trial courts in the exercise of this discretion." *Serras v. First Tennessee Bank National Association,* 875 F.2d 1212, 1214 (6th Cir.1989). Since the parties have, apparently, agreed not to conduct extensive discovery,[4] and the motion is decided on written submissions alone, pursuant to Local Civil Rule 3.01, the weight of Plaintiffs' burden is "merely that of making a *prima facie* showing that person-

al jurisdiction exists." *Id.* As Chief Judge Merritt summarized:

> If the court rules on written submissions alone, the plaintiff may not rest on his pleadings to answer the movant's affidavits, but must set forth, "by affidavit or otherwise[,] ... specific facts showing that the court has jurisdiction." [*Weller v. Cromwell Oil Co.,* 504 F.2d] at 930. When the trial court has determined that the motion to dismiss for lack of personal jurisdiction can be decided upon these written submissions, it "must consider the pleadings and affidavits in the light most favorable to the plaintiff." *Welsh v. Gibbs,* 631 F.2d 436, 439 (6th Cir.1980), *cert. denied,* 450 U.S. 981, 101 S.Ct. 1517, 67 L.Ed.2d 816 (1981) (quoting *Poston v. American President Airlines, Ltd.,* 452 F.Supp. 568, 571 (S.D.Fla. 1978) .... **If she meets [the *prima facie* ] burden the motion to dismiss should be denied, "notwithstanding any controverting presentation by the moving party."** *Marine Midland Bank [v. Miller,* ] 664 F.2d [899] at 904 [2d Cir. 1981].[5] (Emphasis supplied).

*Serras,* at 1214.

#### 2. Due Process Standard

In diversity cases, it is settled that the assertion of personal jurisdiction must

---

4. Indeed, the parties have agreed to stay all discovery until the pending motions were decided by this Court. This practice seems, in retrospect, unwise. The factual predicate for asserting personal jurisdiction has not been crystal clear as to each Defendant; further discovery, at least limited to this issue, could have resolved the personal jurisdiction issue, and certainly buttressed the *prima facie* showing for personal jurisdiction. Furthermore, if discovery had shown that personal jurisdiction were lacking in Ohio as to any or all Defendants, Plaintiffs could have refiled, or requested severance or transfer to a more appropriate forum.

5. As *Serras* explained, before meaningful discovery has taken place, and the parties have a chance to gather proof from the opposing party, trial courts do not engage in trial by affidavit:

> The court's solicitude for defendants who object to its personal jurisdiction is always tempered, however, by its concern that the door to a federal courtroom not be slammed in the face of a plaintiff seeking to invoke its powers where there is, in fact, no defect in personal jurisdiction. **Particularly where disputed**

**jurisdictional facts are intimately intertwined with the parties' dispute on the merits, a trial court should not require plaintiffs to mount "proof which would, in effect, establish the validity of their claims and their right to the relief sought."** . *Milligan v. Anderson,* 522 F.2d 1202, 1207 (10th Cir.1975); [*U.S. v.*] *Montreal Trust Co.,* 358 F.2d [239] at 242 [2nd Cir.1966].

*Serras,* 875 F.2d at 1215. (Emphasis supplied).

*Serras* further noted two additional reasons for not resolving, at this early stage, conflicting affidavits. First, judicial resources may be more efficiently employed if there is one, not several, evidentiary hearings on disputed jurisdictional facts. Second, postponing proof until trial—when discovery has been completed—allows the plaintiff to present the proof "in a coherent, orderly fashion and without the risk of prejudicing his case on the merits." *Serras,* supra, at 1215 (quoting *Data Disc Inc. v. Systems Technology Associates, Inc.,* 557 F.2d 1280, 1285–86 n. 2 (9th Cir.1977)).

This case illustrates the wisdom of the *Serras* approach. To a great extent, the affidavits conflict; the Defendants have filed a Motion to

comport with both the state long-arm statute and the Due Process Clause of the United States Constitution. Fed.R.Civ.P. 4(e); U.S. Const. Amend. 5, 14. *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). Plaintiff relies on three provisions of the Ohio long-arm statute, Ohio Rev.Code Ann. § 2307.382,[6] which provides in pertinent part:

(A) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's:

(1) Transacting any business in this state;

(2) Contracting to supply services or goods in this state;

(3) causing tortious injury by an act or omission in this state.

\* \* \* \* \* \*

(C) When jurisdiction over a person is based solely upon this section, only a cause of action arising from acts enumerated in this section may be asserted against him.

The Sixth Circuit has repeatedly interpreted the Ohio long-arm statute, particularly the "transacting any business" provision, as extending to the outer limits under the Due Process Clause. *See Creech v. Roberts*, 908 F.2d 75, 79 (6th Cir.1990); *American Greetings Corp. v. Cohn*, 839 F.2d 1164 (6th Cir.1988); *R.L. Lipton Distributing Co. v. Dribeck Importers, Inc.*, 811 F.2d 967, 969 (6th Cir.1987); *In–Flight Devices Corp. v. Van Dusen Air, Inc.*, 466 F.2d 220, 225 (6th Cir.1972).[7] Thus, "an

---

Strike the Plaintiff's Affidavit because it is "replete with inadmissible evidence," such as hearsay. *Reply Brief of Defendants to Plaintiff's Brief in Opposition* at 1–4. Although the Defendants cite several cases–*A.L. Pickens Company, Inc. v. Youngstown Sheet & Tube Co.*, 650 F.2d 118, 121 (6th Cir.1981); *Copiers Typewriters Calculators, Inc.* [*v. Toshiba* ], 576 F.Supp. 312, 316 (D.Md.1983); *Chromium Industries v. Mirror Polishing & Plating*, 448 F.Supp. 544, 553 (N.D. Ill.1978), their reliance is misplaced. Each of these cases arose on summary judgment motions, after discovery had taken place.

Here, little, if any discovery has taken place. It is worth noting that before 1912, "suits in equity were determined largely on the paper record created by the parties." S. Burbank, *The Costs of Complexity*, 85 Mich.L.Rev. 1463, 1480 (1987). In 1912, the Supreme Court changed Equity Rule 46 to read "[i]n all trials in equity the testimony of witnesses shall be taken orally in open court, except as otherwise provided by statute or these rules." 226 U.S. 661 (1912). Burbank, *supra*, at n. 92.

While the opportunity for discovery and depositions is critical, Plaintiffs have only to meet a *prima facie* burden at this stage. Following discovery, they will have to meet the burden of a preponderance of the evidence.

6. In Ohio, there apparently remains an unresolved question whether the long-arm statute, § 2307.382, or the comparable Civil Rule 4.3(A)(3), governs. *See, e.g., Giachetti v. Holmes*, 14 Ohio App.3d 306, 471 N.E.2d 165, 167 n. 1 (1984) (Markus, J.) (Noting presumed conflict under Section 5, Art. IV of the Ohio Constitution); 22 *Ohio Jurisprudence 3d,* Courts and Judges § 277 at 416 (1980). Although both the statute and rule were amended in 1988, the Ohio Supreme Court, in *Fallang v. Hickey*, 40 Ohio St.3d 106, 532 N.E.2d 117 (1988), relied

upon Civ.R. 4.3(A)(3). The federal courts, however, have relied upon the statute—*see Creech v. Roberts*, 908 F.2d 75 (6th Cir.1990); *American Greetings Corp. v. Cohn*, 839 F.2d 1164 (6th Cir.1988). Because the pertinent provisions of the statute and rule are identical, the analysis for the case *sub judice* is the same.

7. As Defendants have noted, lower appellate courts of this state have not always construed the Ohio long arm statute as extending to the federal constitutional limitations of due process. *See Ohio State Tie & Timber, Inc., v. Paris Lumber Co.*, 8 Ohio App.3d 236, 456 N.E.2d 1309, 1313 (1982); *Monroe Distributing, Inc. v. McClung*, Civ. No. 44991 (Ct.App.1983) (unreported) (available on WESTLAW database 1983 WL 5818.) This argument may be foreclosed by the Ohio Supreme Court's decision in *Fallang v. Hickey*, 40 Ohio St.3d 106, 532 N.E.2d 117 (1988), which analyzed Ohio Civ.R. 4.3(A)(3)—nearly identical to § 2307.382(A)(3)—under the Due Process Clause and caselaw. In paragraph 1 of the Syllabus, the Ohio Supreme Court held that under Civ.R. 4.3(A)(3) [A defendant who commits "tortious injury by an act or omission in this state"] authorizes assertion of personal jurisdiction over nonresident defendants in a defamation action when publication of the offending communication occurs in Ohio.

Nonetheless, a federal court, sitting in diversity, has a duty "to decide questions of state law when necessary for the disposition of a case brought to it for decision, although the highest court of the state had not [definitively] answered them...." *Meredith v. Winter Haven*, 320 U.S. 228, 237, 64 S.Ct. 7, 12, 88 L.Ed. 9 (1943). Furthermore, under Sixth Circuit precedent, this Court will assume that the Ohio long-arm

Ohio personal jurisdictional analysis becomes an examination of constitutional limitations." *American Greetings,* 839 F.2d at 1167 (quoting *Lipton,* 811 F.2d at 969). The fundamental inquiry will be whether each Defendant has "minimum contacts" with the forum state [Ohio] and whether the exercise of jurisdiction offends "traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. at 316, 66 S.Ct. at 158, 90 L.Ed. at 102 (1945).

The Supreme Court has repeatedly stressed that "each defendant's contacts with the forum state must be assessed individually." *Calder v. Jones,* 465 U.S. 783, 790, 793, 104 S.Ct. 1482, 1489, 79 L.Ed.2d 804 (1984) *Rush v. Savchuk,* 444 U.S. 320, 332, 100 S.Ct. 571, 579, 62 L.Ed.2d 516 (1980) ("The requirements of *International Shoe* ... must be met as to each defendant over whom a state court exercises jurisdiction.")

In the Sixth Circuit, there are three criteria that must be met to comport with due process:

> First, the defendant must purposely avail himself of the privilege of acting in the forum state or causing a consequence in the foreign state. Second, the cause of action must arise from the defendants' activities there. Finally, the acts of the defendant or consequences must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

*LAK, Inc. v. Deer Creek Enterprises,* 885 F.2d 1293, 1299 (6th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1525, 108 L.Ed.2d 764 (1990) (citing *Southern Machine Co. v. Mohasco Industries,* 401 F.2d 374, 381 (6th Cir.1968)).

The contacts of each Defendant are analyzed separately.

### 3. Kirchfeld of West Germany

 Kirchfeld argues and submits affidavits (Bornmann Affidavit ["Aff."], Thom-

as & Rohrig Aff., Volker & Rohrig Aff.)[8] that it lacks minimum contacts with the Ohio, the forum state. In response, Lyman has produced an Affidavit of its Vice–President, Steve Green ("Green Aff.") and Exhibits showing that Kirchfeld purposefully availed itself of the privilege of acting in Ohio by "transacting business" and contracting to supply goods and services within this state. It is undisputed that Lyman and Kirchfeld entered into a series of contracts to supply unique goods—AR steel plate—at specified quantities and times, with Kirchfeld. Complaint, Exh. A, Green Aff. ¶¶ 7–11. There was an option to buy more steel; this was not a one-time contract. Kirchfeld, as an intermediary, was essential to establishing this international transaction; it was paid through an Ohio bank. Complaint, Exh. A. On Aug. 11–12, 1987, Kirchfeld sent its agent, Otto–Hans Bornmann—a Director of Kirchfeld—Plaintiff's Brief in Opposition, Exh. D (*Cf.* Bornmann's own Affidavit, which is silent as to which company—Kirchfeld or Ferrostaal he is or was a "Direktor") to Lyman's place of business in Warrensville Heights, Ohio to confer with Lyman because the AR plate shipments were tardy. Green Aff., ¶ 12. Bornmann stayed at a Beachwood Hotel; during the day he spent at Lyman's facility, he placed two telephone calls to Ferrostaal of West Germany and spoke at length with Helmut Julius, a Director of Ferrostaal of West Germany. *Id.,* at ¶ 13; Plaintiffs' Brief in Opposition, Exhs. B–C.

With respect to interstate contractual obligations, the Supreme Court has emphasized

> parties who 'reach out beyond one state and create continuing relationships and obligations with citizens of another state' are subject to regulation and sanctions in the other State for the consequences of their activities. *Travelers Health Ass'n v. Virginia,* 339 U.S. 643, 647, 70 S.Ct. 927, 929, 94 L.Ed. 1154 (1950).

statute extends to the constitutional limitations of Due Process.

**8.** The affidavits of the Defendants are used only for context; for *prima facie* purposes, contrary

allegations in Lyman's affidavits are treated as true, and conflicts are resolved in favor of Lyman. *Serras,* 875 F.2d at 1215.

*Burger King v. Rudzewicz,* 471 U.S. 462, 473, 105 S.Ct. 2174, 2182, 85 L.Ed.2d 528 (1985); *Creech, supra,* 908 F.2d at 80; *Lak, supra,* 885 F.2d at 1300.

The purposeful availment requirement ensures that a defendant will not be haled into a jurisdiction solely because of "random," "fortuitous," or "attenuated" contacts. *Burger King, supra,* at 475, 105 S.Ct. at 2183, 85 L.Ed.2d 528. Yet the intentional contractual relationship between Lyman and Kirchfeld can hardly be characterized as random, fortuitous, or attenuated. Despite this fact, Kirchfeld argues that Lyman, not Kirchfeld, directed the delivery of goods in the contract[9]; therefore, Kirchfeld did not purposefully avail itself of the privilege of acting in Ohio. At first, this argument might have a superficial attractiveness. On the other hand, when a contractual supplier or dealer performs, at the request of the buyer, a service for the convenience of the buyer— (particularly, when one considers the availability of Great Lake shipping), it is harder to argue that the dealer has not reached out beyond one state to create continuing relationships and obligations with citizens of another. *Lak v. Deer Creek Enterprises,* 885 F.2d at 1300. It is the relationship between the parties—an obligation to perform—not where the goods end up, that determines purposeful availment: Justice Brennan stated:

> [I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial ac-

tor's efforts are "purposefully directed" toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there. *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774–75 [104 S.Ct. 1473, 1478, 79 L.Ed.2d 790]; *Calder v. Jones,* 465 U.S. at 788–790 [104 S.Ct. at 1486–87]; *McGee v. International Life Insurance Co.,* 355 U.S. [220] at 222–23, 78 S.Ct. 199, 200–01, 2 L.Ed.2d 223 (1957); [*Hoopeston Canning Co. v.*] *Cullen,* 318 U.S. 313, 317 [63 S.Ct. 602, 605, 87 L.Ed. 777] (1943).

*Burger King, supra,* 471 U.S. at 476, 105 S.Ct. 2174, 85 L.Ed.2d 528.

Another formulation of the first *Southern Machine* factor is causing a consequence in the forum state. A defendant's contractual obligations could have a realistic and foreseeable impact upon the commerce of the forum state. Here, the goods are alleged to be unique; the failure to provide all the goods will have consequences to Lyman, an Ohio citizen. *Wright International Express, Inc. v. Roger Dean Chevrolet, Inc.,* 689 F.Supp. 788, 791 (S.D.Ohio 1988).

Furthermore, the Plaintiffs allege that Kirchfeld, along with the other two Defendants, converted the 64 steel plates to their own use. Tortious acts committed by nonresidents, within the forum state, constitute purposeful availment of the forum. *See Keeton v. Hustler,* 465 U.S. 770, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984); *Calder v. Jones,* 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) (libel). The tort of conversion[10] is analogous to this type of intentional tort.

---

**9.** The telex reads, in pertinent part:

SHIPMENT: 1ST. SHIPMENT OF 2,000 M.T.— SHIPMENT **JANUARY, 1987.**
2ND. SHIPMENT OF 6,000 M.T.—SHIPMENT MARCH, 1987.
DESTINATION: 1ST. SHIPMENT TO BE FOR EAST COAST U.S.A., IN ORDER OF PREFERENCE FOR PORTS OF: BALTIMORE, MD. WILMINGTON, DE. CAMDEN, N.J. PHILADELPHIA, PA. **IN ADDITION THE FIRST SHIPMENT MAY BE MADE TO THE PORT OF BRIDGEPORT BUT THE 2ND SHIP-**

**MENT SHALL BE DIRECTLY TO CLEVELAND.**
＊　　＊　　＊　　＊　　＊　　＊
OTHER CONDITIONS:
1. IT IS UNDERSTOOD THAT AN OPTION IS AVAILABLE FOR THE 3RD AND 4TH QTRS. OF 1987 FOR A FURTHER 6,000 METRIC TONS, FOR DELIVERY TO CLEVELAND BEFORE THE CLOSE OF NAVIGATION, GREAT LAKES, WHICH PRICE IS TO BE FINALISED BETWEEN THE PARTIES BY THE 30TH OF JUNE, 1987.

**10.** Under Ohio law,

Under the second *Southern Machine* factor, the cause of action must arise from the Defendant's actions. An action "will be deemed not to have arisen from the defendant's contacts with the forum state only when they are unrelated to the operative facts of the controversy." *Creech, supra,* (citing *Third National Bank v. Wedge Group Inc.,* 882 F.2d 1087, 1091 (6th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 870, 107 L.Ed.2d 953 (1990). The breach of contract meets that test, as the Sixth Circuit has explained:

> Defendant's transaction of business in Ohio—its entering of a contractual relationship with an Ohio corporation is necessarily the very soil from which the action for breach grew. The intimate relationship between the jurisdictional basis and the cause of action necessary to the validity of any single act cannot be denied here. *In Flight Devices v. Van Dusen Air, Inc.,* 466 F.2d 220, 229 (6th Cir.1972).

The third factor of the *Southern Machine* test asks whether, in light of the first two factors, the assertion of personal jurisdiction would be reasonable. When the first two factors are met, there is an inference that the third factor is met, and only the unusual case will not satisfy the third factor. *Wedge Group, supra,* 882 F.2d at 1092; *First National Bank of Louisville v. J.W. Brewer Tire Co.,* 680 F.2d 1123, 1126 (6th Cir.1982). Merely because Kirchfeld is a German corporation, *ipso facto,* is not enough to make the assertion unreasonable.

Therefore, the Plaintiffs have met their *prima facie* burden as to Kirchfeld.

4. Ferrostaal U.S.A.

■ Plaintiffs allege that Ferrostaal U.S.A. is a subsidiary of Ferrostaal of West Germany, a competitor of Lyman, converted the steel to its own use. Complaint, ¶ 3; Green Aff. ¶¶ 14–15. While Bornmann—purportedly a Director of Kirchfeld—*see* Plaintiffs' Brief in Opposition, Exh. D.—visited Lyman in August, 1987 regarding the late shipment of steel, he phoned Ferrostaal of West Germany and spoke at length with Helmut, Julius, a Director of Ferrostaal West Germany. Green Aff. ¶ 13. He also phoned the Chicago Office of Ferrostaal U.S.A., travelled to Chicago to confer about the late shipments, and called Green at home to report on the results of his meeting in Chicago. *Id.,* at ¶¶ 14–15. The only other shipments of steel on the M/V Mayombe and M/V Likouala belonged to Ferrostaal of West Germany; one customer of Ferrostaal of West Germany or Ferrostaal U.S.A. was in Northeast Ohio, Wilkoff Morris Co. of Canton. *Id.,* at ¶ 18; the balance of the shipment (as well as the missing steel) continued to Chicago. *Id.,* at ¶ 19.

Furthermore, Lyman has shown that on October 27, 1988, three months after this action was filed, Ferrostaal U.S.A. filed an action styled *Ferrostaal Corp. v. M/V Likoula et al.,* C88–3976 (N.D.Ohio) (Aldrich, J.)[11] This lawsuit, filed as an admiralty action, involves some of the same parties, the same ship (M/V Likoula) and a similar date at issue here, and allegations of missing steel from Galatz, Romania. Ferrostaal also alleges that steel plates were to be delivered and stored in Cleveland, Ohio. The allegations Plaintiffs argue that this conduct is simply inconsistent with the assertion that jurisdiction is lacking. *Rauch v. Day & Night Manufacturing Corp.,* 576 F.2d 697 (6th Cir.1978) (Party waives defense of *in personam* jurisdiction if it is not raised in the " 'first defensive move,'

---

[a] conversion is recognized as any exercise of dominion or control wrongfully exerted over the personal property of another in denial of or under a claim inconsistent with his rights. *Railroad Co. v. O'Donnell* 1892, 49 Ohio St. 489, 32 N.E. 476; *Baird v. Howard* (1894), 51 Ohio St. 57, 36 N.E. 732; *Fulks v. Fulks* (1953), 95 Ohio App. 515, 121 N.E.2d 180; 18 *Ohio Jurisprudence 3d* (1980) Conversion and Replevin, Section 12.

*Ohio Telephone Equipment Sales, Inc. v. Hadler Realty Co.,* 24 O.App.3d 91, 493 N.E.2d 289 (1985).

Conversion may be accomplished by acts of ownership by a defendant or its agents. 18 *Ohio Jurisprudence 3d,* Conversion and Replevin § 12 at 488.

**11.** Franz Kirchfeld AG is also a named defendant in this action.

whether by Rule 12 motion or by a responsive pleading." (quoting 5 C. Wright, A. Miller, *Federal Practice & Procedure* § 1391 at 855 (1969)); *Najran Co. v. Fleetwood Enterprises, Inc.,* 659 F.Supp. 1081 (S.D.Ga.1986) (affirmative use of judicial apparatus is waiver of defense); *National Homes Corp. v. Totem Mobile Home Sales, Inc.,* 140 Ariz. 434, 682 P.2d 439 (Ariz.App.1984).

Ferrostaal of West Germany argues that it did not file a Complaint in its own name—its insurer, Lloyds of London, having the right under a subrogation contract did. It is, however, unnecessary to resolve the waiver issue. Voluntarily filing a lawsuit, through one's agent, where the facts similarly arise from the same series of events as another lawsuit can be deemed another indication of purposeful availment of the forum.

Since if these allegations, if true, would meet the *prima facie* showing under all three *Southern Machine* factors, at this stage, the Court concludes that it has personal jurisdiction over Ferrostaal U.S.A.

### 5. Ferrostaal of West Germany

█ Plaintiffs have presented several arguments for the assertion of personal jurisdiction over Ferrostaal of West Germany. First, Ferrostaal of West Germany allegedly converted the steel; second, from the relationship between its wholly owned its subsidiaries, Kirchfeld and Ferrostaal U.S.A. one should impute personal jurisdiction.

Lyman alleges that its competitor, Ferrostaal of West Germany purposefully availed itself of the Ohio by sending steel plates, as the only other consignee on the ships, to its Ohio customer—Wilkoff Morris in Canton, Ohio. Green Aff. at ¶ 18. After Bornmann, Kirchfeld's Director, phoned Ferrostaal of West Germany from Lyman's headquarters regarding the late shipments of steel, Green suspected that Kirchfeld and Ferrostaal were one in the same. *Id.,* at ¶¶ 13, 16. When Lyman notified Ferrostaal U.S.A. about the missing shipments, it received, on April 28, 1988, the following telex from Ferrostaal of West Germany, with cc to Ferrostaal U.S.A. in Chicago, stating:

RE: M/V "LIKOUALA" SHORTAGES—YR ORDER 33.519.

FIRST OF ALL WE WANT TO POINT OUT THAT THE A/M BUSINESS HAS BEEN CONCLUDED BETWEEN KIRCHFELD AND YOUR COMPANY. FERROSTAAL DOES NOT HAVE ANYTHING TO DO WITH THIS CONTRACT.

IT IS OBVIOUS THAT FOR MATERIAL BEING DISCHARGED DURING NOVEMBER LAST YEAR NOBODY IN THE WORLD IS PREPARED TO DISCUSS TODAY ABOUT SHORTAGES. KIRCHFELD IS ALSO NOT ABLE TO DO SO.

BESIDES THIS, YOU HAVE RECEIVED B/L'S STATING CLEARLY EXACT NUMBER OF PIECES SHIPPED ON THIS VESSEL. IN SUCH CASE THE ONLY POSSIBILITY TO BE RECOVERED FOR PROBABLE SHORTAGES IS FOR YOU TO ADDRESS TO YOUR INSURANCE COMPANY.

AS FAR AS WE KNOW THIS IS, HOWEVER, ONLY POSSIBLE IF YOU HAVE CLAIMED THE SHORTAGES ALREADY AGAINST THE VESSEL OR VESSEL'S AGENT WHEN MATERIAL HAS BEEN DISCHARGED. WE REGRET THAT KIRCHFELD CANNOT BE OF ANY ASSISTANCE TO YOU IN THIS CASE.

IN THE NAME OF KIRCHFELD WE HEREBY REFUSE ANY RESPONSIBILITY FOR ANY SHORTAGES OR LOSSES.

KIND REGARDS,

R. LETTMAN.

Plaintiffs' Brief in Opposition, Exh. E. (Emphasis supplied.)

Lyman further alleges that it learned after placing its order in December, 1986, that Ferrostaal of West Germany owned all of Kirchfeld—Green Aff. at ¶¶ 9–10.

Contracting to provide goods to an Ohio customer would be purposeful availment of the forum. Since the allegations involve

similar shipments, on the same ship, and Ferrostaal of West Germany is alleged to have intentionally converted the steel, a *prima facie* case has been established under the *Southern Machine* factors.

As an alternative theory, there is *prima facie* evidence of an inescapable, close interrelationship among the three Defendants. Ferrostaal of West Germany's Affidavit by Helmut Julius and Bernd Kraft avers that Ferrostaal owns all of the capital stock of Kirchfeld, but Kirchfeld has not merged with Ferrostaal. Julius Aff. ¶¶ 4–5. Instead, Kirchfeld is a "daughter corporation" under West German law, which purportedly deems them "more distant, distinct, and separate than a parent-subsidiary relationship." *Id.,* ¶ 15. Lyman's Vice President, Steve Green states that Kirchfeld ceased to exist in its own name, that Kirchfeld business with Romania was transacted in the name of Ferrostaal, former Kirchfeld employees were rehired by Ferrostaal, and that R. Lettman was a former employee of Kirchfeld. Green Aff. ¶¶ 20–23. Although the Ferrostaal Affidavits maintain that the two corporations are separate and independent, the Lettman letter suggests an agency relationship. There may be an agency by estoppel. *Creech, supra,* at 81 (citing *Blackwell v. UAW,* 9 O.App.3d 179, 458 N.E.2d 1272, 1275 (1983)).

The Plaintiffs seek to pierce the corporate veil because Ferrostaal, U.S.A., the owner of Kirchfeld, has common Directors (2 of 6) with Kirchfeld (Thomas & Rohrig Aff. ¶ 5) the activities of Bornmann, and the letter of R. Lettman.

In *Cannon Mfg Co. v. Cudahy Packing Co.,* 267 U.S. 333, 337, 45 S.Ct. 250, 251, 69 L.Ed. 634 (1925), the Supreme Court held that the activities of a subsidiary did not subject the parent corporation to the personal jurisdiction of the local court. However, the Sixth Circuit in *Velandra v. Regie Nationale Des Usines Renault,* 336 F.2d 292 (6th Cir.1964) distinguished the *Can-*

*non* rule and stated that a parent is amenable to the

"personal jurisdiction of local courts because of the local activities of subsidiary corporations upon the theory that the corporate separation is fictitious, or that the parent has held the subsidiary out as its agent, or ... that the parent exercised an undue degree of control over the subsidiary." *Id.,* at 296.

*See Wedge Group,* 882 F.2d at 1093 (Keith, J., concurring) (discussing *Velandra* and citing *Nixon v. Celotex Corp.,* 693 F.Supp. 547, 551 (W.D.Mich.1988) (following *Velandra* to conclude that foreign parent corporation's active participation in local subsidiary's personnel, pension and sales decisions justified exercise of specific jurisdiction over parent.)

From Lyman's allegations, the Green Affidavit, and other showings, one could impute, for *prima facie* purposes, personal jurisdiction over Ferrostaal of West Germany because of the actions of Kirchfeld and Ferrostaal U.S.A, common employees and officers, and conduct.

Therefore, this Court is satisfied that Plaintiffs have established their *prima facie* burden as to Ferrostaal of West Germany.

### C. *Motion to Quash Service of Process.*

On July 15, 1988, Plaintiffs sent a copy of the Summons and Complaint, written in English, by registered mail, return receipt, to Ferrostaal of West Germany and Kirchfeld of Germany, respectively. Defendants' Motion to Dismiss, Exhs. D & E. The return of service for both companies was filed with this Court on August 1, 1988.

Ferrostaal of West Germany and Kirchfeld have moved, pursuant to Fed.R.Civ.P. 12(b)(4) to quash service of process because service was not perfected in accordance with the terms of the Hague Service Convention and West Germany's objections to certain alternative modes of service (such as direct mail), 20 U.S.T. 361.[12] In oppos-

---

**12.** The formal name of the Treaty is: the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial

Matters, (November 15, 1965), entered into force by the United States, February 10, 1969, 20 U.S.T. 361, T.I.A.S. No. 6638, 658 U.N.T.S. 163.

ing this argument, Lyman and Chubb advance two arguments: first, service of process abroad by registered mail, pursuant to Fed.R.Civ.P. 4(i)(1)(D), upon a West German corporation is adequate and the Convention need not apply; alternatively, if the manner of service were inadequate and the Court grants the motion to quash, Lyman should have a reasonable period of time to perfect service of process under the terms of the Hague Service Convention.

■ Although a growing number of federal courts have addressed aspects of the Hague Service Convention, apparently, no reported decisions within this Circuit have addressed the manner of service requirement.[13] Most Courts have held that service under the provisions of the Hague Service Convention must be followed to effect proper service upon a defendant who resides in a signatory country. *Vorhees v. Fischer & Krecke,* 697 F.2d 574, 575 (4th Cir.1983); *Hantover Inc. v. Omet, S.N.C. of Volentieri & C.,* 688 F.Supp. 1377, 1385 (W.D.Mo.1988) (citing 2 J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 4.45 & n. 14 (2d ed. 1989)). As to the non-applicability of the Hague Service Convention, Lyman relies upon *Hunt v. Mobil Oil Corp.,* 410 F.Supp. 4 (S.D.N.Y.1975), which held that service by mail of a West German corporation could be properly perfected under Rule 4(i). The West German Defendants cite several more recent decisions. *See, e.g., Harris v. Browning–Ferris Industries Chem. Serv. Inc.,* 100 F.R.D. 775 (M.D.La.1984). In order to resolve this issue, the Court addresses the terms of the Hague Service Convention in more detail.

The Hague Service Convention is an multilateral international treaty ratified by approximately twenty-five countries, and acceded to by several others. *See* Fed.R.

Civ.P. 4, 28 U.S.C.A. at 130–145 (West Supp.1989). The United States ratified the treaty in 1969, West Germany in 1979. *See Ackermann v. Levine,* 788 F.2d 830, 838 & n. 7 (2d Cir.1986); *Richardson v. Volkswagenwerk,* 552 F.Supp. 73, 78 (W.D.Mo. 1982) (Clark, C.J.). As the Supreme Court has recognized, at the Conference in which the treaty was drafted, the Conferees sought to provide a "simpler way to serve process abroad, to assure that defendants sued in foreign jurisdictions would receive actual and timely notice of suit, and to facilitate proof of service abroad." *Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 698, 108 S.Ct. 2104, 2108, 100 L.Ed.2d 722 (1988); Preamble, Hague Service Convention. This Treaty applies in all civil or commercial cases "where there is occasion to transmit a judicial or extrajudicial document for service abroad" 20 U.S.T. at 362, Art. 1; it establishes a central authority to receive service of documents; and requires the papers served by the central authority to be written in or translated into one of the official languages of the nation addressed—here, the official language is German. Art. 5. A signatory country may consent to alternative methods of service other than a request through the central authority. Arts. 8–11; and signatory countries may ratify provisions of the Treaty subject to conditions or objections. Art. 21; *Bankston v. Toyota Motor Co.,* 889 F.2d 172, 173 (8th Cir.1989).

Clearly, the Hague Service Convention applies to the case *sub judice.* Although the Plaintiffs blithely ignore the specific provisions of the Hague Service Convention, they should have noted, especially after the German Defendants raised the issue, the relevant language of Article 10:

This Memorandum and Order refers to it by its common and less cumbersome name, the Hague Service Convention.

The Treaty is directed to the manner of service of process. The territorial or jurisdictional power of a Court to exercise personal jurisdiction over a non-resident defendant in a diversity case is governed by the long-arm statute.

**13.** In *Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 108 S.Ct. 2104, 100

L.Ed.2d 722 (1988), a foreign parent was deemed served, in the United States, through a U.S. subsidiary, which, under state law, was the foreign parent's involuntary agent for service. The Plaintiff served only the domestic subsidiary. The Supreme Court held that since the service was within the United States, the provisions of the Hague Service Convention regarding service outside the United States did not apply.

**Provided the State of destination does not object,** the present Convention shall not interfere with—

(a) the freedom to send judicial documents, by postal channels, directly to persons abroad,

(b) the freedom of judicial officers, officials or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination. (Emphasis added).

Since the Treaty specifies that ratifying States may reject certain service provisions and add others (Article 21), West Germany, in ratifying the Treaty, specifically rejected the provisions of Article 10. *See* Rule 4, (U.S.C.A. at 139–140), *Harris v. Browning-Ferris Industries Chem. Services,* 100 F.R.D. 775, 777 (M.D.La.1984); *Richardson, supra,* at 78–79. West Germany also requires the translation of documents sought to be served for its nationals.[14]

Although Lyman heavily relies on *Hunt, supra,* which involved service by mail of a West German corporation, its reliance is greatly misplaced. Lyman has failed to note that *Hunt* predated West Germany's 1979 ratification of the Hague Service Convention in 1979, and the *Hunt* case never addressed, nor had reason to address the requirements of the Hague Service Convention. At most, the case addressed only the requirements of service by certified mail under Rule 4(i)(1)(D), which does not require translation into the German language.

Lyman also argues that service, although deficient in law, is sufficient in fact, because the German defendants have actually been served, received notice of the suit, are multinational corporations and are fluent in English. This argument should not carry much weight. Although this argument may ring true, this Court can not assume that every German defendant, similarly served under Rule 4(i), would receive actual notice and have *die AllgemeinBildung*[15] necessary to comprehend legal documents in English. The practical effect of Lyman's argument would require the method of service to be determined under a judge-made, case by case basis, rather than according to clear enacted rules.

■ Although Lyman's arguments are weak, it has attempted to raise, implicitly, a question which may resurface later in this case and has confronted many a federal court—whether the Federal Rules of Civil Procedure conflict with the Treaty.[16] Treaties are, like federal statutes, the law of the land and neither deserves *per se* supremacy over the other; they should receive "equal dignity with treaties entered into by the United States." *Whitney v. Robertson,* 124 U.S. 190, 8 S.Ct. 456, 31 L.Ed. 386 (1888). Where possible, a Court would harmonize the two. *Blanco v. United States,* 775 F.2d 53, 61 (2d Cir.1985) (Friendly, J.).

Several Courts have harmonized the two. *Harris,* 100 F.R.D. at 777–778 ("The Hague Convention is specific as to how service is to be made in a foreign county and the Federal Rules are general and designed to cover all circumstances".).

Additionally, there are principles of comity. West Germany, like the United States, is a Sovereign State; it would be unfair to ignore her reservations to the Treaty as to

---

**14.** Formal service (paragraph 1 of Article 5 of the Convention) shall be permissible only if the document to be served is written in or translated into the German language.

**15.** From the German, die AllgemeinBildung, may be translated as comprehensive education.

**16.** This issue could reoccur in light of the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, opened for signature, March 18, 1970, 23 U.S.T. 2555, T.I.A.S. No. 7444. In *Societe Nationale Industrielle Aerospatiale v. United States District Court for the*

*Southern District of Iowa,* 482 U.S. 522, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987), the Supreme Court held that the Hague Evidence Convention was a permissive supplement, not a preemptive replacement, to the discovery rules under the Federal Rules of Civil Procedure. The Supreme Court rejected any requirement that a Court resort to the Treaty procedures first; the Court "should make use of the Convention procedures when it is determined on a case by case basis that their use will facilitate discovery." 8 C. Wright, A. Miller, *Federal Practice & Procedure* § 2005 (1990 Supp. at 11–12).

service of her citizens within West Germany. *Societe Nationale Industrielle, supra,* 482 U.S. at 538, 543–44 & n. 27, 107 S.Ct. at 2553, 2555 & n. 27, 96 L.Ed.2d 461. The Federal Rules do not abrogate West Germany's rights under the Hague Service Convention.

■ As their alternative argument in case the motion to quash, Lyman requests a reasonable period of time in which to effect service of process. Courts that have faced this question have granted a reasonable period of time. *Vorhees v. Fisher & Krecke,* 697 F.2d 574 (4th Cir.1983); *A.I.M. International v. Battenfeld Extrusions Systems, Inc.,* 116 F.R.D. 633, 639 (M.D. Ga.1987) (sixty days); *Harris,* 100 F.R.D. at 778 (thirty days); *McClenon v. Nissan Motor Corp. in U.S.A.,* 726 F.Supp. 822, 827 (N.D.Fla.1989) (thirty days). Although Lyman could have accomplished service under the Hague Service Convention in the last two years, the Motion to Quash had not been Granted; therefore, Lyman and Chubb will have forty-five days from the entry of this opinion in which to perfect service.

*D. Conclusion.*

Accordingly, since Plaintiffs have met their *prima facie* burden, the Motion to Dismiss for Lack of Personal Jurisdiction is DENIED. The Motion to Quash Service of Process is GRANTED, and Plaintiffs shall have forty-five days to perfect service under the terms of the Hague Service Convention.

IT IS SO ORDERED.